The Honorable, the Judges of the United States Court of Appeals for the Fourth Circuit. Oyez! Oyez! Oyez! All persons having any manner or form of business before the Honorable, the United States Court of Appeals for the Fourth Circuit are admonished to draw an eye and give their attention, for the Court is now sitting. God save the United States and this Honorable Court. All right, thank you. Be seated. Mr. Arnold, whenever you're ready. Chief Judge Traxler, Judge Duncan, Judge Davis, may it please the Court. I am Matt Arnold and I represent the appellant, Sean Smith. This is a First Amendment retaliatory discharge case that was filed against Peter S. Gilchrist, III, on December 15th, 2010. On June 25th, 2012, defendant Appellee filed a motion for summary judgment attacking the elements of the claim under the McVeigh test. After briefing, on August 21st, 2012, the Court, sua sponte, directed the parties to brief qualified immunity. After further briefing, on November 28th, 2012, the Court granted defendant Appellee's motion for summary judgment and dismissed the case with prejudice on the basis that defendant Appellee had qualified immunity. Analytically, for the purposes of summary judgment, the Court assumed that all three prongs of the McVeigh test were met and that plaintiff Appellee had shown a violation of his First Amendment right to free speech and that he was fired for making public comments which he was entitled to make. So the question for the Court was whether the defendant Appellee had qualified immunity for violating plaintiff Appellant's constitutional right to free speech. As such, there are two relevant tests in this case. One, the McVeigh test for determining whether there had been retaliatory discharge of a public employee in violation of the First Amendment right to free speech. And two, the Walker test for whether the employer had qualified immunity for the firing. These two tests merit close consideration in this case. The McVeigh test determines whether there was, in fact, a First Amendment violation for the retaliatory discharge of a public employee, and it has three prongs. First, was the employee speaking as a citizen on a matter of public concern rather than as an employee about a matter of public interest? Two, the balancing part of the test, does the employee's interest in speaking on the matter of public concern outweigh the government's interest in providing effective and efficient services to the public? And three, the causation prong of the analysis, was the employee's speech a substantial factor in the employee's termination decision? Importantly, defendant Appellee's motion for summary judgment attacked these three prongs only, in particular the third prong, causation. Defendant Appellee attacked causation on the contention that the only evidence of the reason for plaintiff appellant's firing, which is obviously a question of defendant Appellee's motives, was through defendant Appellee's direct testimony. Defendant Appellee said that he fired plaintiff appellant because he declined to answer a question about any other policies of the DA's office with which he disagrees in the interrogation, which immediately followed defendant Appellee learning of the interview with Fox News Charlotte. In granting defendant Appellee summary judgment, the court assumed that the McVeigh test was satisfied, which brings us to the Walker test. And the Walker test has two prongs, as this court well knows. The first is, did the defendant violate a constitutional right of the plaintiff? Well, that's resolved by the McVeigh test being assumed to be passed in this case. The second prong is, was the right clearly established at the time of the misconduct? In our analysis, the first prong is assumed by the court and is satisfied. The trial court granted defendant summary judgment and dismissed the case with prejudice because it determined that the right was not, quote, clearly defined, end quote, at the time of the misconduct. We disagree. That's where the rubber meets the road in this appeal. Was plaintiff's right to free speech clearly established when defendant violated it? We contend that it was. Factually, the case involves a government employer, defendant Appellee, who was, at the time, the elected district attorney for Mecklenburg County. How do you define the right that has to be clearly established? Well, Your Honor, thank you for the question. The way in which the right is defined largely informs the answer to the question, and this is an issue we addressed in our brief. Right. The problem is, in every qualified immunity case, what's the level of specificity, or I guess the term that's used is granularity, at which you define the right? Because you can define it so broadly that it's foreordained that the right was clearly established. Does the appellant have the right to speak freely? It just got to be yes. Or you can define it so narrowly that it also preordains an answer. And that's our position that we briefed in our papers, Your Honor. What I'm specifically asking you, how did the district court define it, and how did you define it, and why was the way the district court defined it not correct? The district court defined it with such great granularity, Your Honor, as to preordain the answer. Specifically, how did the district court define it? The right alleged here is the right of an assistant district attorney running for political office to pay money, attend a driving class, and criticize the value of the class as a matter of public concern, where that class is a program directly related to the efficient operation of the district attorney's office, without being terminated by the district attorney. That was the way the trial court defined this right. And it is our position, Your Honor, that that is effectively a super-zoomed-in view of this, and as Your Honor used the word granularity. But not factually inaccurate. It's not factually inaccurate, certainly. And I think the recent decision of Columbia v. Haley actually speaks to this. I think that case holds that when deciding whether a right is clearly established, we ask whether it would be clear to a reasonable official that his conduct was unlawful in the situation he confronted. Right. This is not to say that an official action is protected by qualified immunity, unless the very action in question has previously been held unlawful. But it is to say that in light of preexisting law, the unlawfulness must be apparent, which is exactly this issue. We don't have to have, as the court had in the Bland decision, we did not have to have a Jenkins case out there that is on all fours and is intrinsically in conflict with the factual scenario at issue. And I know this court knows that opinion well. It was offered by Chief Judge Traxler. In that case, there was underlying law that was intrinsically in conflict, such that a reasonable person would not know whether or not their conduct was unlawful at the time. So our case here has two very important distinctions from the Bland case. One, we're not dealing with a lay person who admitted under oath that the conduct violated the First Amendment right to free speech. And two, there is no underlying law that is inherently in conflict that would lead a reasonable person to wonder whether or not their conduct was unlawful at the time it was committed. So the question is whether a reasonable official in the position of the district attorney would have known that firing a palant in retaliation for the interview was a violation of First Amendment rights. And you're saying that the official would because? Because, Your Honor, the long history of the tests. And this is not to say that we take a 30,000-foot view as opposed to a two-foot view of defining the right. But the case law is very clear that under the McVeigh test, this sort of behavior just can't happen. This sort of retaliatory firing simply can't happen. The court assumes, for the purposes of this summary judgment motion, that the McVeigh test is passed. But you're merging, and it seemed to me that you did so in your brief, you're merging prong one and prong two. So let's back prong one out and focus on whether a reasonable official, balancing the factors with which the official was presented, should have known that the right was well established or whether it was, in the words of our case law, a bad guess in a gray area because of the interrelationship between the driving school and the district attorney's office. Can you repeat what? Thank you, Your Honor. And there are several important issues that are touched on by that question. One, as opposed to the Bland case, this is a legal expert who gave the opinion. It doesn't matter, does it? I mean, it's an objective test, isn't it? Well, I don't think so, Your Honor, because in the Bland decision, specifically at page 393, the court goes in great length for three paragraphs about how this is analyzed in relation to a person of no legal education. Well, actually, Bland says that the objective test depends not on what the actual official knew, but what a hypothetical objectively reasonable official would have known. Right. So Bland itself says it's an objective test. But Bland says that it takes into consideration whether or not that official is legally trained. Well, okay. The test, though, is would you acknowledge an objective one? Well, it's interesting in this case. The case law certainly says that it's an objective reasonable person. And that, I think, it's a shoe that doesn't entirely fit this case because what that, I think, does is that is intended to raise the standard from some accident or wrong guess on a gray area to what a reasonable person would do under those circumstances. Here, instead of going from the bottom up to a reasonable person standard, what we've got is a legal expert, a legal expert who's been the elected district attorney for 36 years at the time of this, the elected district attorney who on a day-to-day basis deals with these very issues, constitutional law issues that impact how the case, how the court prosecutes its cases. It would seem to me, though, that that argument could equally easily cut the other way. Presumably he, because of his familiarity, could assume that it didn't violate the First Amendment. Well, it's interesting. He doesn't say that he assumed. He says definitively, yes, when I asked him that question. And the court, the trial court and counsel for appellee observes that that one particular quote that's in the briefs, it just touches barely on the issue. But, in fact, that line of questioning spans 65 pages or so, outlining, describing, talking about the reasons for his discharge, what he understands the discharge had been for. Mr. Gilchrist, his position at his deposition was that, yes, it would have violated his First Amendment rights. Well, his position actually was, that was at the point when he was arguing that Mr. Smith was fired for being insubordinate. Yes, Your Honor, precisely. He effectively says... Which we assume, which, it was in a different context. Well, it was, it wasn't, it wasn't, because I asked him why he fired him. And his position was, effectively, I fired him because he was insubordinate, because he didn't answer that one question after the interview. But, at the end, when I asked him, the punchline, the crescendo to that line of questioning was, you would agree that the comments made to Fox Charlotte, as you understand them to have been made by Sean Smith, were protected by his First Amendment right to free speech. Yes. So, we don't have somebody like we had in Bland, who was a layperson. The court notes, police officers are not expected to parse code language as though they were participating in a law school seminar. And then it finishes with, lay officers, and I'm reading it, page 393, lay officers obviously cannot be expected to perform at the level achievable by those trained in law. So, Bland implicitly recognizes the difference between somebody who's a layperson not being able to reasonably know that their behavior was going to violate somebody's First Amendment rights to free speech, versus somebody who's trained in the law. And that's what we have here, somebody who's trained in the law, who has 36 years experience dealing with constitutional law issues. But, to bring back to the question your Honor asked, the issue of whether or not Peter Gilchrist or any individual who'd been a 36-year district attorney can reasonably know whether or not they can make this termination without violating First Amendment free speech goes back to the very issue that the essence of the McVeigh test, which is, and they acknowledge in their briefs that Mr. Smith was a layperson, was a citizen, speaking on a matter of public concern. That's the first issue. There is no further issue, they don't argue that the balancing test, Mr. Gilchrist doesn't talk about the balancing test at all during his deposition. That's all by Mr. Mentzer. So, it's our contention that consistently with the Columbia case, we don't have to have a line of cases that says specifically a district attorney cannot fire someone, as the court defined it as narrowly as, to pay money, attend a driving class, and criticize the value of a class as a matter of public concern, where that class is a program directly related to the efficient operation of the district attorney's office without being terminated by the DA. We don't have to have a long line of cases that says on those specific facts that it's precluded. And that's what was in effect in the Jenkins decision leading up to the Bland decision. What we have here, I think, is more akin to the Columbia case, where the action is protected by qualified immunity unless the very action in question has previously been held unlawful. But it is to say, as is the case here, that in light of preexisting law, the unlawfulness must be apparent. And the preexisting law is the long line of cases. This is such a fundamental issue that Mr. Gilchrist knows and knew at the time he did this that he crossed the bright line and that he violated Mr. Smith's First Amendment right to free speech and he admitted as much under oath. His position was, it would have had I done it for that reason, but that's not why I did it. So effectively, when he made that admission, this case collapsed down into a factual inquiry. It collapsed into a factual inquiry of what was the reason Mr. Gilchrist terminated Mr. Smith. Was it because he gave the interview to Fox Charlotte, or was it because he was insubordinate? And that issue should be resolved by a jury. Thank you very much. All right, Mr. Smith. Excuse me, Mr. Valentine. I see Mr. Smith's going to do the rebuttal. May it please the court. My name is Grady Valentine. I'm a Special Deputy Attorney General with the North Carolina Department of Justice. I'm representing the long-serving, but now retired, District Attorney for Mecklenburg County, North Carolina, Peter Gilchrist, who is the appellee in this case. The only thing clear about this case, contrary to the appellant's argument, is this a case of an assistant district attorney being fired for insubordination. It becomes... But that's sort of by the way, isn't it? I mean, I didn't understand you to continue to argue that on appeal because the district court assumed that issue out of existence. Yes, Judge Duncan, that's correct. But the important point I want to make in raising that is that that's indicative of the appellant's problems with this case from the institution of it through to his argument before this court, is that to get to a First Amendment right, to a violation of his First Amendment right to free speech and retaliation for exercising his free speech, he ignores the intervening act of his insubordination and disrespect to his supervisor. But so did the district court. They took that arguendo, yes, that they take that. But this, and I make the point only because it's indicative of his failure to properly analyze the qualified immunity offense available to the district attorney. He continues to make the same mistake of not recognizing subsequent facts, subsequent issues, second prongs of law. Are you saying this is a factor? No, Your Honor. The insubordination, that that's a factor we used? No, Judge Traxler, not at all. Because, again, we're only dealing with the second prong of qualified immunity. That's the only issue before this court. My point is that it's indicative of his argument is that he always stops short. His meaning? The appellant. But if it's a flaw, it's also a flaw in the district court's treatment, or the district court just assumed it out of existence. It seems to me one thing your argument might be that the insubordination issue was the predicate of Mr. Gilchrist's deposition testimony about had he not been fired for insubordination, it would have been a violation of his constitutional rights. But I don't see how else it has any analytical relevance now. And I apologize if it appeared that I was arguing that. It doesn't have any. My point in raising that is it's indicative of his approach to this case throughout, is that he stops short at first instances, first prongs, first arguments, and he doesn't follow through in his analysis. Well, is it a factor if it's not? Because if it's not a factor, he's perfectly correct in ignoring it. He is correct, and he's fine to ignore it, Your Honor. And I'm just using it as an introduction to the way that he doesn't analyze subsequent factors that are what's before the court. And I apologize for getting hung up on that. So the issue you would agree now, the only issue we've got is prong two, whether or not the right is clearly established. And I imagine you would argue that the district court defined it at the relevant level of specificity. Absolutely. And I think they followed the Edwards v. City of Goldsboro in defining that with the correct level of specificity. And, again, my introductory analysis painting that picture, it goes to that that in defining it, the appellant would have you understand the right to be, I spoke to the press and I was fired for speaking to the press. They would have you define it that broadly. And that's clearly improper. And the district court properly defined it more narrowly, as Edwards taught us to, to the specific right at issue in this case, not just the broad right to speak to the press. How do you distinguish what this plaintiff said with what the plaintiff said in Pickering, which is comments critical of your employer? How do you distinguish the two subjects? With regard to prong two, whether or not it's clearly established. And, again, I think that goes to an important mistake that the appellant is making. In this case, and I think it's important to point out that the uncontroverted evidence of record in this case is that in speaking about the driving school, the appellant would have you believe, again, narrowing the issue. He would have us believe. Remember, we have to take the testimony of the light most favorable to him. Correct, but he would have you believe that the only evidence is that the driving school was not run by, directed by the district attorney's office. It was not a program of the district attorney's office. Okay, are you moving in the direction of distinguishing this from Pickering? Yes. Okay. Yes, Your Honor. In fact, what the evidence of record shows, and uncontroverted evidence, so it's not disputed by the appellant, the district court pointed out, it's not contrary to the appellant's evidence, it just merely expands on the evidence, is that the appellant, when he took the driving course, said he wanted to understand better programs that affected the district courts. He says that himself. He says it wasn't a program that was created or run by or supervised the district attorney's office. That's not the only issue. The issue is that it affects the efficient operation of the district attorney's office. He offered no evidence on that issue. The district attorney and his chief deputy offered significant evidence that it affected, while not a program of the district attorney's office, while not run by that office, that it had a significant impact on the district attorney's office because it alleviated, in the first year, 20,000 cases from the court's office. What's the distinction? The distinction is that this is not just a matter of the district attorney, how he felt about the driving school, how he felt about the appellant's criticisms of the driving school. The distinction is this had a clear effect on the efficient operation of the office. So you're saying the distinguishing point is that he has evidence that it, I'm not understanding it, that it had, because of what he said, had an effect. Pickering did not have an effect, and that's the difference. Well, that's what creates the balance that the district court says then triggers the qualified immunity, makes this not a clearly established right. Well, in Pickering, the teacher publicly criticized the operation of a public school. I think the question is, how is this different? Well, because, again, this affected the efficient operation of the district attorney's office, and it's not been clearly established. How did it affect? Let's just take that. Let's just assume what you're saying is a distinction. Where is it? What is the testimony, taking it in the light most favorable to the plaintiff, that there was an adverse effect? Again, the plaintiff's, the appellant's evidence, the plaintiff's evidence is that he took the school to educate itself. The effect on the DA's office. What is the adverse effect on the district attorney's office because of what he said? Okay. Not actual, not theoretical effect, actual effect. In the record, pages 99, record page 100, record page 122. Don't just give me. And I am your honor, but I was just laying out those references. These are all in the district attorney's depositions in which he talked about how, during the first year, that it alleviated 20,000 cases from the court's docket. No. Excuse me. I'm sorry. Go ahead. I think the question is how did the criticism of the driving program negatively impact the office, not the relationship between the driving program and the office? Well, as the district attorney understood it, and I think that's an important point to make as well because the appellant wants to rely upon that, but the evidence is that the district attorney was not allowed to see the interview. How about this? That the district court was blindsided by the reporter calling him about the criticisms of which he was otherwise unaware and did not have an opportunity to consider. Is that a negative outcome? That's a negative impact on the district attorney's ability to address issues in his office. Yes. Okay. So is that one answer? That's one answer. His understanding is that the interview was critical of the driving school and the existence of the driving school. And when he had his subsequent meeting with the appellant, I believe there's evidence in the record that the appellant acknowledged that he'd always had issues with the driving school. And so the interview was what he understood the interview to be, was being critical of the existence of a school that alleviated significant numbers of cases from the district court dockets. And this impacted the district attorney's office in that it allowed them to focus on other cases and they didn't have to pursue those cases. So it lightened their workload, allowed them to focus on more important cases. Those are the effects to the office. And I don't want to interrupt you. I thought you had another question, Judge Dunbar. Well, the appellant was also asked, is there anything else you don't like about the way I run the office that you would like to share? Right. And the appellant said, no, I don't think so. Right. We'll just hear about it on the evening news. Right. But that actually, doesn't that sort of go to the insubordination, back to the insubordination? Yes. Yes. And in fact, it wasn't just one question. If you read the deposition testimony about the interview, there were several instances throughout. Did you think to notify us that you were giving the interview? No indication that we are going to stop you from talking to the press. In fact, the only evidence of record is that the district attorney encouraged his assistants to talk to the press and the public. But for the reason that's clear in the record, the interview is given. The next day, a day later, I get a call from a reporter saying, will you comment on this interview? So you're blindsided, just out of the blue. You're running this office, and you kind of like to know what's coming. Why isn't that a jury question regarding the effect of the insubordinate behavior on the DA's decision making? That would be if he wasn't entitled to the qualified immunity, Judge Davis. I'm not sure I understand that answer. Well, because the district court, in looking at the first prong, they determined that this was a constitutional right, that his right to speak outweighed the office's right to efficient operation, and that it was a significant factor in his firing. So then we get to the second prong of even given that there was, if we take it as a given, that there was a violation of a constitutional right, is the district attorney entitled to qualified immunity? And then that's the second prong. Was the constitutional right violated, and was that right clearly established? So we're not talking about the insubordination. I was trying to answer Judge Duncan's question, but the issue before this court is not the insubordination. It really was the right clearly established. So you agree the insubordination point is not before us? No. Does not figure into the qualified immunity? Right. But I wanted to try to correct the record that was being painted that there's one question that was repeated a number of times, and it was not one question. The appellant would have you stop at the first question in the second prong, again, a continuation of this not following through with the analysis. But even when he deals with the second prong, he uses a subjective standard, and he repeatedly, as Judge Duncan pointed out, he tries to tie back in the first prong and make this a subjective standard as to what District Attorney Gilchrist felt or believed or acted upon at the time. In doing so, he's clearly trying to get you to change the law. He is trying to get you to apply a subjective standard, and he can point to no case that allows for that. He says, well, the long case law that our courts have been clear all the way to the Supreme Court, that this is clearly an objective standard as to what a reasonable official would have understood at the time, not with 20-20 hindsight, this is not a subjective standard. He says, well, that doesn't really fit this case, and so you should use a subjective standard, because here we're dealing with a legal expert. You're dealing with an attorney, no doubt. We can't argue that. But in the context of this case, you're not dealing with an attorney who has 36 years of practicing employment law and the constitutional issues related to employment law. He's a 36-year prosecutor. He's dealing with constitutional issues related to criminal infractions. But you've just told us that doesn't matter. I mean, it's just an objective what a reasonable official would have known. And I want to make the point why it shouldn't matter, Your Honor, that clearly that doesn't matter. So, again, would it be clearer to an objectively reasonable officer, the officer doesn't have to reserve conflicts in the law? Again, the contour of the right must be so conclusively drawn as to leave no doubt that the challenged action was unconstitutional. That's what's at issue here. You don't challenge that this was a matter of public concern? No. So if, hypothetically, a district attorney in your client's position had said forthrightly, yeah, I didn't like what he said in the interview, so I fired him, would this case be any different? I don't think it would be. That's not the facts before this court, but I don't think it would be. But you would say, you would argue that even if your client or someone in his position had said, I don't like my assistants giving interviews and I don't like what you said in particular, so you're fired. You would say qualified immunity still applied? Not sure I would say that, Your Honor. What's the source of your doubt? Well, that's a different scenario from the first question. Oh, I thought it was exactly the same question. And I apologize if I understood it. I understood the second question to be more broadly. I didn't like the fact that you gave an interview. And I didn't like what you said. And I didn't like what you said, but now you're saying more broadly, I don't want you talking to the press. That is not the record in this case. No, I don't want you talking to the press. I don't like what you said in that interview you gave. Well, I think in that question, then yes, you're still entitled to qualified immunity because what he said in this interview, the district attorney has to look at it and say, how did your speech affect the efficient operation of this office? Which takes us back to Chief Judge Traxler's earlier question. Where in the record is there any evidence that there was an effect? You took us earlier to page 99, which is your client's deposition testimony. But where in the evidence in the record is there any indication that there was an actual effect on the operation of the DA's office as a result of this interview? I'm not aware that there has to be an actual effect when a reasonable official is trying to understand what effect it would have. I thought that's how you distinguish pickering. I thought that's how you distinguish pickering, was to say there was a negative effect in this case where there wasn't one in pickering. Did I misunderstand your question? There's a direct relationship to the efficient operation of this office in the driving school has a direct relationship to the efficient operation of the DA's office. But I don't think that has to be an actual effect. And our case law does say, in fairness, that an official doesn't have to wait for events to unfold to the point that disruption has occurred. Right. So I'm assuming that what you're saying is that the DA foresaw a potential disruptive effect from a circumstance in which such criticisms were being made without any forewarning or discussion. I'm saying in this hypothetical scenario, yes, that's what I would argue the DA saw. And I can see that my time is out, if I could maybe just answer that line of thought here. Thank you, Your Honor. That in this hypothetical scenario, that, yes, the DA has to balance it at the time, doesn't have to wait for the actual events. Thank you. Thank you, Mr. Ballentine. Now Mr. Smith. Your Honor, the issue with respect to effect is that the comments made by Mr. Smith did not have any effect at all on the district attorney's office. And the reason for that is what's outlined in Mr. Smith's affidavit. The driving school is a program that the district court judges use in order to have somebody earn a prayer for judgment continued. It has no relation at all to the DA's office. Well, I don't think the record supports that. And I think the district court, and I don't think as best I could tell that there was any argument, that Smith made any argument about the relationship between the two in response to direct testimony on that point by the DA. And is it Minster? And if there were no effect, there would be no reason for the local press to call the DA. Okay. And the bottom line is Mr. Smith nor anyone knows why the journalist called the district attorney up. But I don't think the record supports the notion that there's no relationship. Is there evidence in the record that Smith put in to rebut the discussions of Mr. Gilchrist and Mr. Minster about the relationship? Minster's testimony that it was important to handle the volume of cases we deal with and the policy of diverting cases to the program that the office initiated and sponsored? I think what Mr. Smith's position on that was is that when you go to the driving school, you're earning a judicial remedy, which is a PJC, which the district attorney's office can't hand out. The reason why he went to the driving school in his affidavit is because he knew that the driving school was a function of being a district court judge, sending somebody to a driving school in order to earn a PJC, which is a judicial remedy. He knew he'd be signing his name on a PJC from which an individual attended the class. He said there was no relationship. And I think that's the reason why in his deposition, Mr. Gilchrist doesn't talk about any sort of association with respect to the driving school. That's from Mr. Minster's deposition. But there's no—Smith doesn't contest it, and I thought the district court found that there was a connection. He would contest it to the extent that the driving school is a program that is utilized by the district attorney's office simply to the extent that district attorneys cannot give out PJCs, and they can't send people to the driving school in order to earn a PJC because a district attorney doesn't hand out a prayer for judgment. That's a judicial remedy. Am I answering that? Well, not really, and I don't know that it makes a lot of difference. I think the district court found that there was a connection. I don't see any refutation of that in the record, and I'm not sure why you think it's necessary for us to find that there was not in order to reverse here. Well, the reason why, Your Honor, I think it's important because Judge Conrad, the trial court relied so heavily on Mr. Minster's deposition testimony about how the interview or the driving school was effective in managing the gross caseload. I think they used the number 20,000 cases go through the system, and they can concentrate on matters that are more pertinent or more important. Okay. Well, in the record, can you point me to evidence that Smith put on to refute Minster's testimony? Specifically, his affidavit doesn't refute those finer points because his affidavit was attached to the complaint, and it was done before Mr. Minster's testimony. But what I would suggest, Your Honor, is that the defendant, the appealant, he never talks about how the driving school is associated with the district attorney's office. He doesn't specifically say how it promoted efficiency within his own personal office. But that's not your argument, and actually, there was testimony to that very effect about the initiation, about the sponsoring, about the cases that are diverted, significantly reducing the number of traffic cases handled by the district attorney's office. There is a fair amount of testimony at JA between JA 92 and 122 about that. And just specifically with respect to the number of cases and the efficiency. That's more when I'm – Mr. Gilchrist's objection to Mr. Smith's comments didn't necessarily focus on that. It was, again, more or less – and again, I think it's important. Mr. Gilchrist never actually even saw the interview, and that's what he states in his deposition, is that his representation of what was stated in the interview came solely from Mr. Smith. And the reason why I bring this up, Your Honor, is when we're dealing with the second prong about whether or not Mr. Gilchrist sitting as a district attorney, whether or not it was reasonable for him to know that there was a violation of the right when he terminated Mr. Smith, I think that Mr. Gilchrist's own comments are what a reasonable district attorney would know. He recognized in his deposition that terminating Mr. Smith for those reasons would be a violation of that right. And I think that's a very important line of questioning within his deposition testimony because if we don't recognize Mr. Gilchrist as being a district attorney, being somebody that practices law, and then we don't couple that with the fact that he acknowledges the violation of the right, it's difficult to see how Mr. Ballantyne's argument would hold any mustard with respect to whether or not a reasonable person would recognize the right, and whether or not the right was clearly defined. Okay. Thank you, Mr. Smith. Thank you, Your Honor. We'll come down to Greek Council and then go into our next case.
judges: William B. Traxler, Jr., Allyson K. Duncan, Andre M. Davis